In re the MARRIAGE OF Joanne F. GUSTIN, Appellant/Respondent,

and

Abraham J. Gustin, Jr., Respondent/Appellant.

Nos. WD 45507, WD 45549 and WD 46587.

Missouri Court of Appeals, Western District.

July 27, 1993.

Motion for Rehearing and/or Transfer to Supreme Court Denied Aug. 31, 1993.

Application to Transfer Denied Oct. 26, 1993.

Robert C. Paden, Paden, Welch, Martin & Albano, Independence, for appellant/respondent.

Don R. Lolli, Beckett, Lolli, Bartunek & Beckett, Kansas City, for respondent/appellant.

Before LOWENSTEIN, P.J., and TURNAGE and KENNEDY, JJ.

TURNAGE, Judge.

Joanne F. Gustin filed suit for the dissolution of her marriage to Abraham J. Gustin, Jr., and sought a division of marital property and maintenance. The court entered a judgment dissolving the marriage, dividing the marital property and awarded Joanne maintenance. Joanne appeals contending the court erred in the division of property and in finding that she was guilty of misconduct during the marriage.[1] Abe appeals the award of maintenance and the award of attorney fees and costs pendente lite. Affirmed in part and reversed and remanded in part.

The case was tried at various times between February 13, 1991 and April 3, 1991.

Joanne and Abe were married on May 18, 1957 and lived together until March 28, 1990 when Abe informed Joanne that he was moving out of their house. At the time they were married Joanne was 21 years of age with a high school education and was employed as a typist by U.S. Steel in Fairfield, Alabama. At that time Abe was attending college and the couple lived on Joanne's $250 per month income. After Abe was graduated from the University of Alabama he worked for Dun and Bradstreet for about a year. He left that employment to begin work with the Schlitz Brewing Company. Joanne remained in her job with U.S. Steel and was earning more money than Abe. After about five years employment with Schlitz, Abe was transferred to Milwaukee. Joanne gave up her job with U.S. Steel to accompany Abe to Milwaukee. After moving to Milwaukee the Gustins decided to start a family and a son, Greg, was born in July 1969. Since that time Joanne has not been employed.

Abe was transferred to Richmond, Virginia by Schlitz and the couple lived there and in McLean, Virginia for two to three years. During the stay in Virginia, Abe was earning from $30,000 to $35,000 per year.

Abe was transferred back to Milwaukee but about five years later he left Schlitz. During the next two years Abe was not employed. Abe thereafter decided to go into

---

1. No appeal was taken from that part of the judgment which dissolved the marriage, therefore that provision is not in question here and is not affected by the disposition of this appeal.

business for himself and obtained a Coors Beer distributorship in the Kansas City area in about 1980. Shortly after moving to Kansas City, the Gustins purchased their home and through the ensuing years of the marriage invested over $300,000 in it.

Abe sold the beer distributorship and thereafter was involved in a number of business entities. In 1986, a business entity in which Abe had an interest acquired the rights to exclusively develop Applebee's restaurants in Missouri and Kansas. At the urging of Joanne, Abe bought out his partners so that he was the sole owner of the right to develop Applebee's. In about 1987, Abe gave up his other business interests to devote full-time to the development of Applebee's. In 1989, Applebee's was transformed from a private company to a public corporation. In the course of the transformation Abe received 808,333 shares of Applebee's stock which constituted 17.5% of the total outstanding stock.[2]

At about the same time, Joanne and Abe began to experience marital problems. During the last half of 1989 and into 1990 Abe began seeing a woman he had known previously, Linda Taylor.

For Christmas 1989, Abe purchased a fur coat for Joanne. Joanne later discovered an invoice which indicated that Abe had purchased a second fur coat and that the invoice had a handwritten notation "Abe Gustin for Linda Taylor." When Joanne confronted Abe he denied that there was anything going on between him and Linda Taylor.

In January 1990, Joanne filed a petition for dissolution but dismissed it a few days later. On March 28, 1990, Abe told Joanne that he was moving out and Joanne filed the petition for dissolution of marriage now involved on April 2, 1990.

In August 1990, Joanne moved to Florida but returned to Kansas City about two months later. When she returned, a girl friend picked her up at the airport and took her to the Gustin home. When they arrived, Joanne saw a car in the driveway and rang the front door bell but no one answered. She used a garage opener which she had to open the garage door but when she reached the door leading into the house from the garage it was locked. When she was unable to open the door Joanne obtained a hatchet and chopped at the door to gain access. While she was chopping at the door, Linda Taylor was on the other side trying to keep Joanne out. This incident was found by the trial court to constitute marital misconduct on the part of Joanne.

During the trial Abe testified that he and Linda Taylor had an intimate relationship.

The court entered judgment on October 8, 1991. In the judgment, the court accepted the valuation of marital property (all property was marital) as calculated by Jerry Heck, Abe's CPA. The valuation was dated February 4, 1991. The court awarded the following property to Joanne with values fixed by Heck as follows:

| Asset | Value | |
|---|---|---|
| IRA (Wife's) | $ 19,136.00 | |
| Residence | $377,000.00 | |
| Land (lots) | $215,000.00 | |
| Life insurance (Wife's) | $ 43,317.00 | |
| Home furnishing (approx.) | $ 20,000.00 | |
| Jewelry | $ 80,000.00 | |
| TOTAL: | $754,453.00 | |
| NET: | $754,453.00 | (approximate only) |

---

2. At time of trial Abe was President, CEO and a Director of Applebee's International. Abe had a voting agreement with two other directors which enabled them to elect three directors out of the seven members of the board.

The court awarded the following property to Abe with the values fixed by Heck:

| Asset | Value |
|---|---|
| Certificates of Deposit | $ 865,000.00 |
| IRA (Husband's) | $ 38,272.00 |
| Municipal Bonds | $ 8,000.00 |
| Marketable Securities | $ 26,250.00 |
| A & B Consulting | $ 5,000.00 |
| Metro Transportation | $ 152,000.00 |
| I–435 | $ 37,500.00 |
| Trans. Realty Assoc. | ( $ 38,671.00) |
| Banjo Partners | ( $ 120,000.00) |
| AG & B | $ 12,500.00 |
| Applebee's Stock | $7,881,247.00 |
| Life insurance (Husband's) | $ 10,405.00 |
| Home furnishing (approx.) | $ 5,000.00 |
| Retirement Plan | $ 54,000.00 |
| TOTAL: | $9,095,174.00 (approximate only) |

| Liabilities | Value | |
|---|---|---|
| Merchants Bank notes | $10,726,487. | ($1,325,000 is disputed including $75,000 withdrawn by Wife) |
| Mission Bank notes | $ 270,789. | |
| Mercantile Bank | $ 337,404. | (disputed) |
| Credit Cards | $ 30,000. | |
| Legal Fees | $ 15,000. | (disputed) |
| TOTAL: | ( $11,379,680.) | |
| NET: | ( $ 2,284,506.) | (approximate only of which $1,677,404 is disputed) |

---

The court gave Joanne a lien on all of the Applebee's stock in the amount of twelve million dollars and ordered that the same be recorded on all stock certificates. It further ordered Joanne to withhold execution and collection of such lien so long as Abe was current in the payment of loans secured by the stock.

The court awarded Joanne maintenance of $7,500 per month but ordered Abe to pay the first mortgage on the marital home of $2,408 per month, the second mortgage of $1,854 per month, and to pay Joanne's medical premium of $214.64 and dental coverage of $51.51 per month. The court ordered that these payments were to be credited toward the $7,500 monthly payments. The balance of $2,973.85 in maintenance was ordered to be paid to the court administrator for payment to Joanne.

The court refused to award Joanne any attorney fees and stated that the lots awarded to her could be sold and the proceeds applied to pay her attorney fees.

The court set out various loans which Joanne had made to a number of people which the court found to be a dissipation of marital assets and stated that it took that into consideration in the division of property. The court ordered Joanne to pay $70,000 to the Merchants Bank which Joanne had with-

drawn from a joint checking account. That amount represented a loan Abe had obtained which the Bank had mistakenly placed in a joint account instead of a separate account held by Abe.

The court simply noted that Abe had made loans to various people including Linda Taylor and her brother.

The court found that Abe's misconduct with Linda Taylor caused the breakdown of the marriage and stated that because of that misconduct the marital home was awarded to Joanne.

Heck valued the Applebee's stock as of February 8, 1991 at $9.75 per share.[3] During the trial, Abe testified that on March 12, 1991 the stock closed at $12.50 per share. Abe testified that at $12.50 per share the stock would have sufficient value to cover all of his debts.

■ Joanne challenges the failure of the court to award her any beneficial interest in the Applebee's stock because the court did not utilize the correct date in determining its value. In *Taylor v. Taylor*, 736 S.W.2d 388, 391[2] (Mo. banc 1987), the Court held that the date of valuation of marital property is the date of trial. The court did not use the value of $12.50 per share which was the last share price shown in the record prior to the entry of judgment some seven months later. Rather, the court used a valuation of $9.75 per share established prior to trial. The court thus failed to value the property as of the date of trial.

■ Joanne also contends the court did not follow the mandate of § 452.330.1(1), RSMo Supp.1988,[4] to consider the economic circumstances of each spouse at the time the division of property was to become effective. Section 452.330.1 directs the court to divide the marital property in such proportions as the court deems just after considering all relevant factors including the economic circumstances of each spouse at the time the division of property is to become effective. In this case, the division became effective on

October 8, 1991. The principal asset was the Applebee's stock. The evidence was that it was worth $9.75 per share on February 8, 1991 and $12.50 per share on March 12, 1991. In just over a month Abe's shares increased in value by $2,222,915.

The necessity of considering the economic circumstances of the parties near the time the division of property is to become effective is illustrated in *Sutliff v. Sutliff*, 518 Pa. 378, 543 A.2d 534 (1988). Although Pennsylvania did not adopt the Uniform Dissolution of Marriage Act, it did adopt a statute that is verbatim with § 452.330.1 in requiring the court to divide the property in such proportions as the court deems just after considering all relevant factors including the economic circumstances of each party at the time the division of property is to become effective. The court stated:

> [O]ne can readily imagine the economic injustices that would be inflicted by distributing property without regard to its value. It cannot be said that distributions based upon stale valuations are based on value, for value is by no means a constant.
>
> \* \* \* \* \* \*
>
> Volatile market conditions and changing economic circumstances can render assets that had been valuable months or years earlier virtually worthless in the present, and vice versa. Publicly traded securities may be worth a fortune one day, and a pittance the next.
>
> \* \* \* \* \* \*
>
> In view of these commonly recognized aspects of valuation, it is difficult to conceive justification for the view that stale valuation data, i.e., data that does not reflect values reasonably proximate to the date of distribution, should be used by the court in setting a distribution scheme.
>
> \* \* \* \* \* \*
>
> To distribute property without regard to those fluctuations would be illogical, and would undermine the legislative intent of making the equitable distribution process

---

**3.** Although Heck dated his valuation letter February 4, 1991, he indicated the Applebee's stock was valued as of February 8, 1991.

**4.** All statutory references are to RSMo Supp. 1988, unless otherwise stated.

responsive to the contemporaneous needs and financial situations of the parties.

*Id.,* 543 A.2d at 537.

The court in *Sutliff* concluded that the judgment had properly been reversed and the cause remanded for a determination of current asset valuations because the values used by the court in making its judgment were stale.

In *In re Marriage of Wells,* 850 P.2d 694 (Colo. banc 1993), the court reached the same result as in *Sutliff* and held that under the same statute as § 452.330.1 in the Uniform Dissolution of Marriage Act, trial courts are to consider the economic circumstances of the parties as they exist at the time that the court finally distributed marital property. *Id.* at 699.

■■■ In this case, the court was required to value the property, including the stock, at the value shown to exist at the time of trial. At the same time, the court was required to make a just division of the marital property after considering the economic circumstances of the parties at the time the division becomes effective. These two concepts are not inconsistent. Valuation of property should be reasonably proximate to the date the division is to be effective. If the effective date of the distribution is not reasonably proximate to the date of valuation, the court should hold another hearing to establish a valuation as close to the effective date of the division as possible. This is especially important in a case such as this in which assets are subject to ever changing value.

■■ The court failed to follow *Taylor* by not valuing the stock at the value shown during trial. In doing so, the court ignored an increase in the value of Abe's shares of over two million dollars during the time evidence was being heard. Further, in this case, a just division of the marital property cannot be made without considering the economic circumstances of the parties at the time the division is to become effective. Certainly the value of Abe's shares is a vital part of the economic circumstances of the parties. To order distribution of property seven months after the last known value of Abe's stock is illogical and completely thwarts the legislative mandate that the division of property shall be just after considering the economic circumstances of each party at the time the division of property is to become effective. Because the court failed to value the property at the time of trial and failed to consider the economic circumstances of the parties at the time the division of property was to be effective, the judgment dividing the marital property must be reversed. The cause will be remanded to receive evidence of the value of the property and to consider the economic circumstances of each spouse at the time the division of property is to become effective.

■■ Joanne raises other questions about the judgment which may arise on remand. She contends that the division of property is flawed because the court took into consideration marital misconduct on the part of Joanne in chopping through the door to gain entrance to the home. In *Burtscher v. Burtscher,* 563 S.W.2d 526, 527–28 (Mo.App. 1978), the court defined marital conduct as used in § 452.330.1(4) to encompass both good conduct and misconduct. *Id.* The court observed that there should not be an inordinate focus upon a particular incident or even a series of incidents, particularly in a marriage of long duration. *Id.* The court stated:

> We believe the conduct factor becomes important when the conduct of one party to the marriage is such that it throws upon the other party marital burdens beyond the norms to be expected in the marital relationship.

*Id.* The court explained that it is misconduct which upsets the balance in a marriage which requires that each spouse contribute equally. *Id.* It is only when the misconduct of one spouse changes the balance so that the other must assume a greater share of the partnership load that it is appropriate that such misconduct can affect the distribution of property. *Id.*

In this case, it is inconceivable that the act of Joanne chopping through the door placed any burdens on the marital relationship sufficient to affect the distribution of property to her. In view of the evidence of the economic

circumstances of the parties, the cost of a door can hardly be said to place a burden upon the marital relationship. The court erred in considering that act of Joanne as marital misconduct.

Joanne further contends that the court erred in taking into consideration in the division of property a finding that she had dissipated marital assets. In *Hogrebe v. Hogrebe*, 727 S.W.2d 193, 197[6] (Mo.App.1987), the court held, " 'If there is substantial evidence that one spouse squandered marital properties, the trial court is authorized to order reimbursement.' " (quoting *In re Marriage of Layton*, 687 S.W.2d 214, 216 (Mo.App. 1984)). It is impossible to tell to what extent the court took into consideration the loans which it found Joanne had made to various people in dividing the property. The only reimbursement the court ordered Joanne to make was the $70,000 which she took from a joint bank account. Although the court noted that Abe had loaned money to various persons and stated that it was taking that into consideration, the court failed to note that Abe admitted he had given $1,000 per month to each of his two nieces over a period of five to six years. On remand, if the court desires to consider the dissipation of marital assets on the part of the parties it should order reimbursement to be made for the amount found to be dissipated. The order that Joanne pay Merchants Bank $70,000 is a part of the division of property and that order is reversed as a result of the reversal of the judgment dividing the property.

Abe has appealed from the judgment ordering him to pay Joanne maintenance. This court finds that the award of maintenance should be reversed, not for the reason assigned by Abe, but in order to allow the court on remand a full range of options in dividing the property and to take into account the property awarded to Joanne in fixing the amount of maintenance as provided in § 452.335.2(1). *Bixler v. Bixler*, 810 S.W.2d 95, 100[11] (Mo.App.1991). Because the court will divide the property on remand, and because the amount of property apportioned to Joanne is considered in setting the

amount of maintenance, if any, awarded to her, the maintenance award must be reversed. However, because of the financial condition of Joanne, on remand the court is ordered to continue the present maintenance award in effect until a final judgment is entered.

 Abe also appeals from the orders pendente lite for attorney fees of $10,000 and costs of $5,000. He contends the orders cannot stand because Joanne failed to file an affidavit as required by § 452.315.1, RSMo 1986, setting forth the factual basis for the motion. This issue was not presented to the motion court[5] and this court may not address issues not raised in the trial court. *Ibarra v. Missouri Poster & Sign Co.*, 838 S.W.2d 35, 40–41[4] (Mo.App.1992).

Abe further contends that the court erred in ordering him to pay costs pendente lite because Rule 81.14(a) provides that when more than one appeal is taken from the same judgment a single record on appeal may be prepared and each appellant shall pay his share of the cost. This argument is moot because the costs on this appeal are being assessed against Abe. However, Abe may take credit for the costs he actually pays for this appeal.

 Abe finally contends that the temporary costs and fees were awarded in error because the financial condition of Joanne and Abe were relatively equal on a monthly cash flow basis. The court held a hearing on the request for temporary costs and fees. Joanne testified that her only income was $2,975 a month which she received from Abe for maintenance. She stated that the Florida real estate awarded to her in the decree had not been placed in her name because apparently the title to such property is in the name of a third person. She further testified that she had a 1991 Prospectus from Applebee's which showed that Abe was paid $305,288 in salary for 1991. She stated that in addition to his salary, he received a dividend of $48,-499. Further, the court took notice at the request of all counsel that on June 8, 1992 Applebee's stock closed at $18.85 per share.

5. The Honorable H. Michael Coburn. Judge Clark had disqualified himself from further participation in this case after the entry of the judgment.

At that price, Abe's shares had a value of 15.2 million.

 The trial court is granted broad discretion in awarding attorney fees and costs. *Hermelin v. Hermelin*, 766 S.W.2d 670, 673[3] (Mo.App.1989). This court will only reverse for an abuse of discretion. *Id.* No abuse of discretion is demonstrated.

The judgment dividing the marital property and awarding maintenance to Joanne and ordering her to pay $70,000 to Merchants Bank is reversed because the court misapplied the law. This cause is remanded with directions to hold a hearing to receive evidence on the value of the property to be divided and to consider the economic circumstances of the parties at the time the division becomes effective. The court may consider the evidence previously introduced, with the limitations previously stated herein, and may consider such further evidence as the parties may present relevant to the division of property and the award of maintenance. The court is directed to continue in force the present order for maintenance to be paid to Joanne until the entry of a final judgment. The judgment awarding Joanne attorney fees and costs pendente lite is affirmed.

 Costs on this appeal are assessed against Abe.[6]

All concur.

---

**6.** This court notes that during the dissolution trial the trial court allowed an attorney, not counsel for either party, to testify without being sworn as a witness. In *Bartlett v. Kansas City Public Service Co.*, 349 Mo. 13, 160 S.W.2d 740, 742[2–5] (1942), the court noted that the common law had developed two safeguards to prevent a tribunal from being misled by false testimony. One of these is the judicial oath administered to witnesses with the attendant penalties for perjury. Section 575.040, RSMo 1986, defines perjury as when a person "knowingly testifies falsely to any material fact upon oath or affirmation legally administered...." When attorneys testify as a witness, their testimony must be given under oath as in the case of any other witness. 98 C.J.S. Witnesses § 320 pp. 18–19 (1972). This is not to suggest that attorneys are not trustworthy, but simply to suggest that when an attorney occupies the position of a witness, an oath or affirmation is required to be administered in the same manner as with any other witness.